(Slip Opinion) OCTOBER TERM, 2012 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## CHAFIN *v*. CHAFIN

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

No. 11–1347.   Argued December 5, 2012—Decided February 19, 2013

The Hague Convention on the Civil Aspects of International Child Ab-
duction requires the judicial or administrative authority of a Con-
tracting State to order a child returned to her country of habitual res-
idence if the authority finds that the child has been wrongfully
removed to or retained in the Contracting State.  The International
Child Abduction Remedies Act (ICARA) implements the Convention
in the United States, granting federal and state courts concurrent ju-
risdiction over Convention actions and directing those courts to de-
cide cases in accordance with the Convention.  ICARA also requires
defendants to pay various expenses incurred by plaintiffs associated
with the return of children.

  Petitioner Mr. Chafin, a United States citizen and member of the
military, married respondent Ms. Chafin, a United Kingdom citizen,
in Germany, where they later had a daughter, E. C.  When Mr. Chaf-
in was deployed to Afghanistan, Ms. Chafin took E. C. to Scotland.
Mr. Chafin was later transferred to Huntsville, Alabama, and Ms.
Chafin eventually traveled there with E. C.  Soon after Ms. Chafin's
arrival, Mr. Chafin filed for divorce and child custody in Alabama.
Ms. Chafin was subsequently deported, but E. C. remained in Ala-
bama with Mr. Chafin.  Several months later, Ms. Chafin filed a peti-
tion under the Convention and ICARA, seeking E. C.'s return to Scot-
land.  The District Court concluded that E. C.'s country of habitual
residence was Scotland and granted the petition for return.  Ms.
Chafin immediately departed for Scotland with E. C.  Ms. Chafin
then initiated custody proceedings in Scotland and was granted inter-
im custody and a preliminary injunction prohibiting Mr. Chafin from
removing E. C. from Scotland.  Mr. Chafin appealed the District
Court's order, but the Eleventh Circuit dismissed the appeal as moot,

on the ground that once a child has been returned to a foreign country, a U. S. court becomes powerless to grant relief. On remand, the District Court ordered Mr. Chafin to reimburse Ms. Chafin for court costs, attorney's fees, and travel expenses.

*Held*: The return of a child to a foreign country pursuant to a Convention return order does not render an appeal of that order moot. Pp. 5–14.

   (a) Article III restricts the power of federal courts to "Cases" and "Controversies," and this "requirement subsists through all stages of [the] proceedings," *Lewis* v. *Continental Bank Corp.*, 494 U. S. 472, 477. No case or controversy exists, and a suit becomes moot, "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome," *Already, LLC* v. *Nike, Inc.*, 568 U. S. ___, ___. But a case "becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party," *Knox* v. *Service Employees*, 567 U. S. ___, ___. As "long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot," *ibid*. Pp. 5–6.

   (b) Because the Chafins continue to vigorously contest the question of where their daughter will be raised, this dispute is very much alive. This case does not address "a hypothetical state of facts," *Lewis*, *supra,* at 477, and there continues to exist between the parties "that concrete adverseness which sharpens the presentation of issues," *Camreta* v. *Greene*, 563 U. S. ___, ___. Pp. 6–11.

      (1) Mr. Chafin seeks typical appellate relief: reversal of the District Court determination that E. C.'s habitual residence was Scotland and, upon reversal, an order that E. C. be returned to the United States. The question is whether such relief would be effectual. In arguing that this case is moot because the District Court has no authority to issue a re-return order either under the Convention or pursuant to its inherent equitable powers, Ms. Chafin confuses mootness with the merits. See, *e.g.*, *Powell* v. *McCormack*, 395 U. S. 486, 500. Mr. Chafin's claim for re-return cannot be dismissed as so implausible that it is insufficient to preserve jurisdiction, and his prospects of success are therefore not pertinent to the mootness inquiry. As to the effectiveness of any relief, even if Scotland were to ignore a re-return order, this case would not be moot. The U. S. courts continue to have personal jurisdiction over Ms. Chafin and may command her to take action under threat of sanctions. She could decide to comply with an order against her and return E. C. to the United States. Enforcement of the order may be uncertain if Ms. Chafin chooses to defy it, but such uncertainty does not typically render cases moot. Pp. 7–10.

      (2) Mr. Chafin also seeks, if he prevails, vacatur of the District Court's expense orders. That too is common relief on appeal, and the

Syllabus

mootness inquiry comes down to its effectiveness. In contending that this case is moot due to Mr. Chafin's failure to pursue an appeal of the expense orders, which were entered as separate judgments, Ms. Chafin again confuses mootness with the merits. Because there is authority for the proposition that failure to appeal such judgments separately does not preclude relief, it is for lower courts at later stages of the litigation to decide whether Mr. Chafin is in fact entitled to the relief he seeks. That relief would not be "'fully satisfactory,'" but "even the availability of a 'partial remedy' is 'sufficient to prevent [a] case from being moot,'" *Calderon* v. *Moore*, 518 U. S. 149, 150. Pp. 10–11.

(c) Manipulating constitutional doctrine and holding these cases moot is not necessary to achieve the ends of the Convention and IC-ARA, and may undermine the treaty's goals and harm the children meant to be protected. If these cases were to become moot upon return, courts would be more likely to grant stays as a matter of course, to prevent the loss of any right to appeal. Such routine stays would conflict with the Convention's mandate of prompt return. Courts should instead apply traditional factors in considering whether to stay a return order, see, *e.g.*, *Nken* v. *Holder*, 556 U. S. 418, 434, thus ensuring that each case will receive the individualized treatment necessary for appropriate consideration of the child's best interests. Finally, at both the district and appellate court level, courts should take steps to decide these cases as expeditiously as possible. Pp. 11–14.

Vacated and remanded.

ROBERTS, C. J., delivered the opinion for a unanimous Court. GINSBURG, J., filed a concurring opinion, in which SCALIA and BREYER, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 11–1347

JEFFREY LEE CHAFIN, PETITIONER *v.* LYNNE HALES CHAFIN

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

[February 19, 2013]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

The Hague Convention on the Civil Aspects of International Child Abduction generally requires courts in the United States to order children returned to their countries of habitual residence, if the courts find that the children have been wrongfully removed to or retained in the United States. The question is whether, after a child is returned pursuant to such an order, any appeal of the order is moot.

I

A

The Hague Conference on Private International Law adopted the Hague Convention on the Civil Aspects of International Child Abduction in 1980. T. I. A. S. No. 11670, S. Treaty Doc. No. 99–11. In 1988, the United States ratified the treaty and passed implementing legislation, known as the International Child Abduction Remedies Act (ICARA), 102 Stat. 437, 42 U. S. C. §11601 *et seq.* See generally *Abbott* v. *Abbott*, 560 U. S. \_\_\_, \_\_\_–\_\_\_ (2010) (slip op., at 4–5).

The Convention seeks "to secure the prompt return of

children wrongfully removed to or retained in any Con-
tracting State" and "to ensure that rights of custody and
of access under the law of one Contracting State are ef-
fectively respected in the other Contracting States." Art. 1,
S. Treaty Doc. No. 99–11, at 7. Article 3 of the Convention
provides that the "removal or the retention of a child is to
be considered wrongful" when "it is in breach of rights of
custody attributed to a person, an institution or any other
body, either jointly or alone, under the law of the State
in which the child was habitually resident immediately
before the removal or retention" and "at the time of re-
moval or retention those rights were actually exercised,
either jointly or alone*,* or would have been so exercised but
for the removal or retention." *Ibid.*

Article 12 then states:

> "Where a child has been wrongfully removed or re-
> tained in terms of Article 3 and, at the date of the
> commencement of the proceedings before the judicial
> or administrative authority of the Contracting State
> where the child is, a period of less than one year has
> elapsed from the date of the wrongful removal or re-
> tention, the authority concerned shall order the re-
> turn of the child forthwith." *Id.,* at 9.

There are several exceptions to that command. Return
is not required if the parent seeking it was not exercising
custody rights at the time of removal or had consented to
removal, if there is a "grave risk" that return will result in
harm, if the child is mature and objects to return, or if
return would conflict with fundamental principles of free-
dom and human rights in the state from which return is
requested. Arts. 13, 20, *id.,* at 10, 11. Finally, the Con-
vention directs Contracting States to "designate a Central
Authority to discharge the duties which are imposed by
the Convention." Art. 6, *id.,* at 8; see also Art. 7, *ibid.*
   Congress established procedures for implementing the

Convention in ICARA. See 42 U. S. C. §11601(b)(1). The Act grants federal and state courts concurrent jurisdiction over actions arising under the Convention, §11603(a), and directs them to "decide the case in accordance with the Convention," §11603(d). If those courts find children to have been wrongfully removed or retained, the children "are to be promptly returned." §11601(a)(4). ICARA also provides that courts ordering children returned generally must require defendants to pay various expenses incurred by plaintiffs, including court costs, legal fees, and transportation costs associated with the return of the children. §11607(b)(3). ICARA instructs the President to designate the U. S. Central Authority, §11606(a), and the President has designated the Office of Children's Issues in the State Department's Bureau of Consular Affairs, 22 CFR §94.2 (2012).

Eighty-nine nations are party to the Convention as of this writing. Hague Conference on Private Int'l Law, Status Table, Convention of 25 October 1980 on the Civil Aspects of International Child Abduction, http://www.hcch.net. In the 2009 fiscal year, 324 children removed to or retained in other countries were returned to the United States under the Convention, while 154 children removed to or retained in the United States were returned to their countries of habitual residence. Dept. of State, Report on Compliance with the Hague Convention on the Civil Aspects of International Child Abduction 6 (2010).

B

Petitioner Jeffrey Lee Chafin is a citizen of the United States and a sergeant first class in the U. S. Army. While stationed in Germany in 2006, he married respondent Lynne Hales Chafin, a citizen of the United Kingdom. Their daughter E. C. was born the following year.

Later in 2007, Mr. Chafin was deployed to Afghanistan,

and Ms. Chafin took E. C. to Scotland.  Mr. Chafin was eventually transferred to Huntsville, Alabama, and in February 2010, Ms. Chafin traveled to Alabama with E. C.  Soon thereafter, however, Mr. Chafin filed for divorce and for child custody in Alabama state court.  Towards the end of the year, Ms. Chafin was arrested for domestic violence, an incident that alerted U. S. Citizenship and Immigration Services to the fact that she had overstayed her visa.  She was deported in February 2011, and E. C. remained in Mr. Chafin's care for several more months.

In May 2011, Ms. Chafin initiated this case in the U. S. District Court for the Northern District of Alabama.  She filed a petition under the Convention and ICARA seeking an order for E. C.'s return to Scotland.  On October 11 and 12, 2011, the District Court held a bench trial.  Upon the close of arguments, the court ruled in favor of Ms. Chafin, concluding that E. C.'s country of habitual residence was Scotland and granting the petition for return.  Mr. Chafin immediately moved for a stay pending appeal, but the court denied his request.  Within hours, Ms. Chafin left the country with E. C., headed for Scotland.  By December 2011, she had initiated custody proceedings there.  The Scottish court soon granted her interim custody and a preliminary injunction, prohibiting Mr. Chafin from removing E. C. from Scotland.  In the meantime, Mr. Chafin had appealed the District Court order to the Court of Appeals for the Eleventh Circuit.

In February 2012, the Eleventh Circuit dismissed Mr. Chafin's appeal as moot in a one-paragraph order, citing *Bekier* v. *Bekier*, 248 F. 3d 1051 (2001).  App. to Pet. for Cert. 1–2.  In *Bekier*, the Eleventh Circuit had concluded that an appeal of a Convention return order was moot when the child had been returned to the foreign country, because the court "became powerless" to grant relief.  248 F. 3d, at 1055.  In accordance with *Bekier*, the Court of Appeals remanded this case to the District Court with

instructions to dismiss the suit as moot and vacate its order.

On remand, the District Court did so, and also ordered Mr. Chafin to pay Ms. Chafin over $94,000 in court costs, attorney's fees, and travel expenses. Meanwhile, the Alabama state court had dismissed the child custody proceeding initiated by Mr. Chafin for lack of jurisdiction. The Alabama Court of Civil Appeals affirmed, relying in part on the U. S. District Court's finding that the child's habitual residence was not Alabama, but Scotland.

We granted certiorari to review the judgment of the Court of Appeals for the Eleventh Circuit. 567 U. S. \_\_\_ (2012).

## II

Article III of the Constitution restricts the power of federal courts to "Cases" and "Controversies." Accordingly, "[t]o invoke the jurisdiction of a federal court, a litigant must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be re-dressed by a favorable judicial decision." *Lewis* v. *Continental Bank Corp.*, 494 U. S. 472, 477 (1990). Federal courts may not "decide questions that cannot affect the rights of litigants in the case before them" or give "opin-ion[s] advising what the law would be upon a hypothetical state of facts." *Ibid.* (quoting *North Carolina* v. *Rice*, 404 U. S. 244, 246 (1971) (*per curiam*); internal quotation marks omitted). The "case-or-controversy requirement subsists through all stages of federal judicial proceedings, trial and appellate." *Lewis*, 494 U. S., at 477. "[I]t is not enough that a dispute was very much alive when suit was filed"; the parties must "continue to have a 'personal stake'" in the ultimate disposition of the lawsuit. *Id.,* at 477–478 (quoting *Los Angeles* v. *Lyons*, 461 U. S. 95, 101 (1983); some internal quotation marks omitted).

There is thus no case or controversy, and a suit becomes

moot, "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Already, LLC* v. *Nike, Inc.*, 568 U. S. \_\_\_, \_\_\_ (2013) (slip op., at 4) (quoting *Murphy* v. *Hunt*, 455 U. S. 478, 481 (1982) (*per curiam*); some internal quotation marks omitted). But a case "becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Knox* v. *Service Employees*, 567 U. S. \_\_\_, \_\_\_ (2012) (slip op., at 7) (internal quotation marks omitted); see also *Church of Scientology of Cal.* v. *United States*, 506 U. S. 9, 12 (1992) ("if an event occurs while a case is pending on appeal that makes it impossible for the court to grant 'any effectual relief whatever' to a prevailing party, the appeal must be dismissed" (quoting *Mills* v. *Green*, 159 U. S. 651, 653 (1895))). "As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Knox*, *supra,* at \_\_\_ (slip op., at 7) (internal quotation marks and brackets omitted).

## III

This dispute is still very much alive. Mr. Chafin continues to contend that his daughter's country of habitual residence is the United States, while Ms. Chafin maintains that E. C.'s home is in Scotland. Mr. Chafin also argues that even if E. C.'s habitual residence was Scotland, she should not have been returned because the Convention's defenses to return apply. Mr. Chafin seeks custody of E. C., and wants to pursue that relief in the United States, while Ms. Chafin is pursuing that right for herself in Scotland. And Mr. Chafin wants the orders that he pay Ms. Chafin over $94,000 vacated, while Ms. Chafin asserts the money is rightfully owed.

On many levels, the Chafins continue to vigorously contest the question of where their daughter will be raised. This is not a case where a decision would address

"a hypothetical state of facts." *Lewis*, *supra,* at 477 (quoting *Rice*, *supra,* at 246; internal quotation marks omitted). And there is not the slightest doubt that there continues to exist between the parties "that concrete adverseness which sharpens the presentation of issues." *Camreta* v. *Greene*, 563 U. S. \_\_\_, \_\_\_ (2011) (slip op., at 5) (quoting *Lyons*, *supra,* at 101; internal quotations marks omitted).

## A

At this point in the ongoing dispute, Mr. Chafin seeks reversal of the District Court determination that E. C.'s habitual residence was Scotland and, if that determination is reversed, an order that E. C. be returned to the United States (or "re-return," as the parties have put it). In short, Mr. Chafin is asking for typical appellate relief: that the Court of Appeals reverse the District Court and that the District Court undo what it has done. See *Arkadelphia Milling Co.* v. *St. Louis Southwestern R. Co.*, 249 U. S. 134, 145–146 (1919); *Northwestern Fuel Co.* v. *Brock*, 139 U. S. 216, 219 (1891) ("Jurisdiction to correct what had been wrongfully done must remain with the court so long as the parties and the case are properly before it, either in the first instance or when remanded to it by an appellate tribunal"). The question is whether such relief would be effectual in this case.

Ms. Chafin argues that this case is moot because the District Court lacks the authority to issue a re-return order either under the Convention or pursuant to its inherent equitable powers. But that argument—which goes to the meaning of the Convention and the legal availability of a certain kind of relief—confuses mootness with the merits. In *Powell* v. *McCormack*, 395 U. S. 486 (1969), this Court held that a claim for backpay saved the case from mootness, even though the defendants argued that the backpay claim had been brought in the wrong court and therefore could not result in relief. As the Court

explained, "this argument . . . confuses mootness with whether [the plaintiff] has established a right to recover . . . , a question which it is inappropriate to treat at this stage of the litigation." *Id.,* at 500. Mr. Chafin's claim for re-return—under the Convention itself or according to general equitable principles—cannot be dismissed as so implausible that it is insufficient to preserve jurisdiction, see *Steel Co.* v. *Citizens for Better Environment*, 523 U. S. 83, 89 (1998), and his prospects of success are therefore not pertinent to the mootness inquiry.

As to the effectiveness of any relief, Ms. Chafin asserts that even if the habitual residence ruling were reversed and the District Court were to issue a re-return order, that relief would be ineffectual because Scotland would simply ignore it.[1] But even if Scotland were to ignore a U. S. re-return order, or decline to assist in enforcing it, this case would not be moot. The U. S. courts continue to have personal jurisdiction over Ms. Chafin, may command her to take action even outside the United States, and may back up any such command with sanctions. See *Steele* v. *Bulova Watch Co.*, 344 U. S. 280, 289 (1952); cf. *Leman* v. *Krentler-Arnold Hinge Last Co.*, 284 U. S. 448, 451–452 (1932). No law of physics prevents E. C.'s return from

---

[1] Whether Scotland would do so is unclear; Ms. Chafin cited no authority for her assertion in her brief or at oral argument. In a recently issued decision from the Family Division of the High Court of Justice of England and Wales, a judge of that court rejected the "concept of automatic re-return of a child in response to the overturn of [a] Hague order." *DL* v. *EL*, [2013] EWHC 49, ¶59 (Judgt. of Jan. 17). The judge in that case did not ignore the pertinent re-return order—issued by the District Court in *Larbie* v. *Larbie*, 690 F. 3d 295 (CA5 2012), cert. pending, No. 12–304—but did not consider it binding in light of the proceedings in England.

Earlier in those proceedings, the Family Division of the High Court directed the parties to provide this Court with a joint statement on the status of those proceedings. This Court is grateful for that consideration.

Scotland, see *Fawcett* v. *McRoberts*, 326 F. 3d 491, 496 (CA4 2003), abrogated on other grounds by *Abbott* v. *Abbott*, 560 U. S. \_\_\_ (2010), and Ms. Chafin might decide to comply with an order against her and return E. C. to the United States, see, *e.g., Larbie* v. *Larbie*, 690 F. 3d 295, 303–304 (CA5 2012) (mother who had taken child to United Kingdom complied with Texas court sanctions order and order to return child to United States for trial), cert. pending, No. 12–304.[2]  After all, the consequence of compliance presumably would not be relinquishment of custody rights, but simply custody proceedings in a different forum.

Enforcement of the order may be uncertain if Ms. Chafin chooses to defy it, but such uncertainty does not typically render cases moot.  Courts often adjudicate disputes where the practical impact of any decision is not assured. For example, courts issue default judgments against defendants who failed to appear or participate in the proceedings and therefore seem less likely to comply.  See Fed. Rule Civ. Proc. 55.  Similarly, the fact that a defendant is insolvent does not moot a claim for damages.  See 13C C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure §3533.3, p. 3 (3d ed. 2008) (cases not moot "even though the defendant does not seem able to pay any portion of the damages claimed").  Courts also decide cases against foreign nations, whose choices to respect final rulings are not guaranteed.  See, *e.g., Republic of Austria* v. *Altmann*, 541 U. S. 677 (2004) (suit against Austria for return of paintings); *Republic of Argentina* v. *Weltover, Inc.*, 504 U. S. 607 (1992) (suit against Argentina for repayment of bonds).  And we have heard the Govern-

---

[2] Ms. Chafin suggests that the Scottish court's *ne exeat* order prohibits E. C. from leaving Scotland.  The *ne exeat* order, however, only prohibits Mr. Chafin from removing E. C. from Scotland; it does not constrain Ms. Chafin in the same way.

ment's appeal from the reversal of a conviction, even though the defendants had been deported, reducing the practical impact of any decision; we concluded that the case was not moot because the defendants might "re-enter this country on their own" and encounter the consequences of our ruling. *United States* v. *Villamonte-Marquez*, 462 U. S. 579, 581, n. 2 (1983).

So too here. A re-return order may not result in the return of E. C. to the United States, just as an order that an insolvent defendant pay $100 million may not make the plaintiff rich. But it cannot be said that the parties here have no "concrete interest" in whether Mr. Chafin secures a re-return order. *Knox*, 567 U. S., at ___ (slip op., at 7) (internal quotation marks omitted). "[H]owever small" that concrete interest may be due to potential difficulties in enforcement, it is not simply a matter of academic debate, and is enough to save this case from mootness. *Ibid.* (internal quotation marks omitted).

B

Mr. Chafin also seeks, if he prevails, vacatur of the District Court's expense orders. The District Court ordered Mr. Chafin to pay Ms. Chafin over $94,000 in court costs, attorney's fees, and travel expenses. See Civ. No. 11–1461 (ND Ala., Mar. 7, 2012), pp. 15–16; Civ. No. 11–1461 (ND Ala., June 5, 2012), p. 2. That award was predicated on the District Court's earlier judgment allowing Ms. Chafin to return with her daughter to Scotland. See Civ. No. 11–1461 (ND Ala., Mar. 7, 2012), pp. 2–3, and n. 2.[3] Thus, in conjunction with reversal of the judgment,

⎯⎯⎯⎯⎯⎯

[3] The award was predicated on the earlier judgment even though that judgment was vacated. The District Court cited Eleventh Circuit cases for the proposition that if a plaintiff obtains relief before a district court and the case becomes moot on appeal, the plaintiff is still a prevailing party entitled to attorney's fees. We express no view on that question. The fact remains that the District Court ordered Mr. Chafin to pay

Mr. Chafin desires vacatur of the award. That too is common relief on appeal, see, *e.g., Fawcett, supra*, at 501, n. 6 (reversing costs and fees award when reversing on the issue of wrongful removal), and the mootness inquiry comes down to its effectiveness.

At oral argument, Ms. Chafin contended that such relief was "gone in this case," and that the case was therefore moot, because Mr. Chafin had failed to pursue an appeal of the expense orders, which had been entered as separate judgments. Tr. of Oral Arg. 33; see Civ. No. 11–1461 (ND Ala., Mar. 7, 2012); Civ. No. 11–1461 (ND Ala., June 5, 2012). But this is another argument on the merits. Mr. Chafin's requested relief is not so implausible that it may be disregarded on the question of jurisdiction; there is authority for the proposition that failure to appeal such judgments separately does not preclude relief. See 15B Wright, Miller, & Cooper, *supra*, §3915.6, at 230, and n. 39.5 (2d ed., Supp. 2012) (citing cases). It is thus for lower courts at later stages of the litigation to decide whether Mr. Chafin is in fact entitled to the relief he seeks— vacatur of the expense orders.

Such relief would of course not be "'fully satisfactory,'" but with respect to the case as whole, "even the availability of a 'partial remedy' is 'sufficient to prevent [a] case from being moot.'" *Calderon* v. *Moore*, 518 U. S. 149, 150 (1996) (*per curiam*) (quoting *Church of Scientology*, 506 U. S., at 13).

## IV

Ms. Chafin is correct to emphasize that both the Hague Convention and ICARA stress the importance of the prompt return of children wrongfully removed or retained. We are also sympathetic to the concern that shuttling

─────────

attorney's fees and travel expenses based on its earlier ruling. A reversal, as opposed to vacatur, of the earlier ruling could change the prevailing party calculus and afford Mr. Chafin effective relief.

children back and forth between parents and across inter-
national borders may be detrimental to those children.
But courts can achieve the ends of the Convention and
ICARA—and protect the well-being of the affected chil-
dren—through the familiar judicial tools of expediting
proceedings and granting stays where appropriate. There
is no need to manipulate constitutional doctrine and hold
these cases moot. Indeed, doing so may very well under-
mine the goals of the treaty and harm the children it is
meant to protect.

If these cases were to become moot upon return, courts
would be more likely to grant stays as a matter of course,
to prevent the loss of any right to appeal. See, *e.g., Garri-
son* v. *Hudson*, 468 U. S. 1301, 1302 (1984) (Burger, C. J.,
in chambers) ("When . . . the normal course of appellate
review might otherwise cause the case to become moot,
issuance of a stay is warranted" (citation and internal
quotation marks omitted)); *Nicolson* v. *Pappalardo*, Civ.
No. 10–1125 (CA1, Feb. 19, 2010) ("Without necessarily
finding a clear probability that appellant will prevail, we
grant the stay because . . . a risk exists that the case could
effectively be mooted by the child's departure"). In cases
in which a stay would not be granted but for the prospect
of mootness, a child would lose precious months when she
could have been readjusting to life in her country of habit-
ual residence, even though the appeal had little chance of
success. Such routine stays due to mootness would be
likely but would conflict with the Convention's mandate of
prompt return to a child's country of habitual residence.

Routine stays could also increase the number of appeals.
Currently, only about 15% of Hague Convention cases are
appealed. Hague Conference on Private Int'l Law, N.
Lowe, A Statistical Analysis of Applications Made in 2008
Under the Hague Convention of 25 October 1980 on the
Civil Aspects of International Child Abduction, Pt. III–
National Reports 207 (2011). If losing parents were effec-

tively guaranteed a stay, it seems likely that more would appeal, a scenario that would undermine the goal of prompt return and the best interests of children who should in fact be returned. A mootness holding here might also encourage flight in future Hague Convention cases, as prevailing parents try to flee the jurisdiction to moot the case. See *Bekier*, 248 F. 3d, at 1055 (mootness holding "to some degree conflicts with the purposes of the Convention: to prevent parents from fleeing jurisdictions to find a more favorable judicial forum").

Courts should apply the four traditional stay factors in considering whether to stay a return order: "'(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.'" *Nken* v. *Holder*, 556 U. S. 418, 434 (2009) (quoting *Hilton* v. *Braunskill*, 481 U. S. 770, 776 (1987)). In every case under the Hague Convention, the well-being of a child is at stake; application of the traditional stay factors ensures that each case will receive the individualized treatment necessary for appropriate consideration of the child's best interests.

Importantly, whether at the district or appellate court level, courts can and should take steps to decide these cases as expeditiously as possible, for the sake of the children who find themselves in such an unfortunate situation. Many courts already do so. See Federal Judicial Center, J. Garbolino, The 1980 Hague Convention on the Civil Aspects of International Child Abduction: A Guide for Judges 116, n. 435 (2012) (listing courts that expedite appeals). Cases in American courts often take over two years from filing to resolution; for a six-year-old such as E. C., that is one-third of her lifetime. Expedition will help minimize the extent to which uncertainty adds to

the challenges confronting both parents and child.

\* \* \*

The Hague Convention mandates the prompt return of children to their countries of habitual residence. But such return does not render this case moot; there is a live dispute between the parties over where their child will be raised, and there is a possibility of effectual relief for the prevailing parent. The courts below therefore continue to have jurisdiction to adjudicate the merits of the parties' respective claims.

The judgment of the United States Court of Appeals for the Eleventh Circuit is vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

───────────

No. 11–1347

───────────

## JEFFREY LEE CHAFIN, PETITIONER *v.* LYNNE HALES CHAFIN

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE ELEVENTH CIRCUIT

[February 19, 2013]

JUSTICE GINSBURG, with whom JUSTICE SCALIA and JUSTICE BREYER join, concurring.

The driving objective of the Hague Convention on the Civil Aspects of International Child Abduction (Convention) is to facilitate custody adjudications, promptly and exclusively, in the place where the child habitually resides. See Convention, Oct. 25, 1980, T. I. A. S. No. 11670, Arts. 1, 3, S. Treaty Doc. No. 99–11, p. 7 (Treaty Doc.). To that end, the Convention instructs Contracting States to use "the most expeditious procedures available" to secure the return of a child wrongfully removed or retained away from her place of habitual residence. Art. 2, *ibid.*; see Art. 11, *id.*, at 9 (indicating six weeks as the target time for decision of a return-order petition); Hague Conference on Private International Law, Guide to Good Practice Under the Hague Convention of 25 October 1980 on the Civil Aspects of International Child Abduction, Part I–Central Authority Practice, §1.5.1, p. 19 (2010) (Guide to Good Practice) ("Expeditious procedures are essential at all stages of the Convention process."). While "[the] obligation to process return applications expeditiously . . . extends to appeal procedures," *id.*, Part IV–Enforcement, §2.2, ¶51, at 13, the Convention does not prescribe modes of, or time frames for, appellate review of first instance decisions. It therefore rests with each Contracting State

to ensure that appeals proceed with dispatch.

Although alert to the premium the Convention places on prompt return, see 42 U. S. C. §11601(a)(4), Congress did not specifically address appeal proceedings in the legislation implementing the Convention.  The case before us illustrates the protraction likely to ensue when the finality of a return order is left in limbo.

Upon determining that the daughter of Jeffrey Chafin and Lynne Chafin resided in Scotland, the District Court denied Mr. Chafin's request for a stay pending appeal, and authorized the child's immediate departure for Scotland. The Eleventh Circuit, viewing the matter as a *fait accompli*, dismissed the appeal filed by Mr. Chafin as moot.[1]  As the Court's opinion explains, the Eleventh Circuit erred in holding that the child's removal to Scotland rendered further adjudication in the U. S. meaningless.  Reversal of the District Court's return order, I agree, could provide Mr. Chafin with meaningful relief.  A determination that the child's habitual residence was Alabama, not Scotland, would open the way for an order directing Ms. Chafin to "re-return" the child to the United States and for Mr. Chafin to seek a custody adjudication in an Alabama state

---

[1] The Court of Appeals instructed the District Court to vacate the return order, thus leaving the child's habitual residence undetermined. The Convention envisions an adjudication of habitual residence by the return forum so that the forum abroad may proceed, immediately, to the adjudication of custody.  See Convention, Arts. 1, 16, 19, Treaty Doc., at 7, 10, 11.  See also *DL* v. *EL*, [2013] EWHC 49 (Family Div.), ¶36 (Judgt. of Jan. 17 ) ("[T]he objective of Hague is the child's prompt return to the country of the child's habitual residence so that that country's courts can determine welfare issues."); Silberman, Interpreting the Hague Abduction Convention: In Search of a Global Jurisprudence, 38 U. C. D. L. Rev. 1049, 1054 (2005) (typing the "return" remedy as "provisional," because "proceedings on the merits of the custody dispute are contemplated in the State of the child's habitual residence once the child is returned there").

court.[2]  But that prospect is unsettling.  "[S]huttling chil-
dren back and forth between parents and across interna-
tional borders may be detrimental to those children," *ante*,
at 12, whose welfare led the Contracting States to draw up
the Convention, see 1980 Conférence de La Haye de droit
international privé, Enlèvement d'enfants, E. Pérez-Vera,
Explanatory Report, in 3 Actes et Documents de la Qua-
torzième session, ¶23, p. 431 (1982).  And the advent of
rival custody proceedings in Scotland and Alabama is just
what the Convention aimed to stave off.

  This case highlights the need for both speed and cer-
tainty in Convention decisionmaking.  Most Contracting
States permit challenges to first instance return orders.
See Guide to Good Practice, Part IV–Enforcement, §2.3,
¶57, at 14.  How might appellate review proceed con-
sistent with the Convention's emphasis on expedition?
According to a Federal Judicial Center guide, "[e]xpedited
procedures for briefing and handling of [return-order]
appeals have become common in most circuits."  J. Gar-
bolino, The 1980 Hague Convention on the Civil Aspects of
International Child Abduction: A Guide for Judges 116
(2012).[3]  As an example, the guide describes *Charalam-*

——————

  [2] As the Court observes, *ante*, at 8, n. 1, a judge of the Family Divi-
sion of the High Court of Justice of England and Wales recently con-
cluded that "the concept of automatic re-return of a child in response to
the overturn of [a] Hague order pursuant to which [the child] came [to
England] is unsupported by law or principle, and would . . . be deeply
inimical to [the child's] best interests."  *DL* v. *EL*, [2013] EWHC 49,
¶59(e).  If Mr. Chafin were able to secure a reversal of the District
Court's return order, the Scottish court adjudicating the custody
dispute might similarly conclude that the child should not be re-
returned to Alabama, notwithstanding any U. S. court order to the
contrary, and that jurisdiction over her welfare should remain with the
Scottish court.

  [3] For the federal courts, the Advisory Committees on Federal Rules of
Civil and Appellate Procedures might consider whether uniform rules
for expediting Convention proceedings are in order.  Cf. *ante*, at 14
(noting that "[c]ases in American courts often take over two years from

*bous* v. *Charalambous*, 627 F. 3d 462 (CA1 2010)
(*per curiam*), in which the Court of Appeals stayed a re-
turn order, expedited the appeal, and issued a final judg-
ment affirming the return order 57 days after its entry.
Once appellate review established the finality of the re-
turn order, custody could be litigated in the child's place
of habitual residence with no risk of a rival proceeding
elsewhere.

But as the Court indicates, stays, even of short duration,
should not be granted "as a matter of course," for they
inevitably entail loss of "precious months when [the child]
could have been readjusting to life in her country of habit-
ual residence." *Ante*, at 12; see Tr. of Oral Arg. 39. See
also *DL* v. *EL*, [2013] EWHC 49 (Family Div.), ¶38 (Judgt.
of Jan. 17) ("[Children] find themselves in a sort of Hague
triangle limbo, marooned in a jurisdiction from which
their return has been ordered but becalmed by extended
uncertainty whether they will in the event go or stay.").
Where no stay is ordered, the risk of a two-front battle
over custody will remain real. See *supra*, at 2–3. See also
*Larbie* v. *Larbie*, 690 F. 3d 295 (CA5 2012) (vacating re-
turn order following appeal in which no stay was sought).[4]

*Amicus* Centre for Family Law and Policy calls our
attention to the management of Convention hearings and
appeals in England and Wales and suggests that proce-
dures there may be instructive. See Brief for Centre for
Family Law and Policy 22–24 (Centre Brief). To pursue
an appeal from a return order in those domains, leave
must be obtained from the first instance judge or the
Court of Appeal. Family Procedure Rules 2010, Rule 30.3
(U. K.). Leave will be granted only where "the appeal

———————

filing to resolution").

[4] The *Larbie* litigation, known by another name in the English courts,
illustrates that the risk of rival custody proceedings, and conflicting
judgments, is hardly theoretical. Compare *Larbie*, 690 F. 3d 295, with
*DL* v. *EL*, [2013] EWHC 49.

would have a real prospect of success; or . . . there is some other compelling reason why the appeal should be heard." *Ibid.* Although an appeal does not trigger an automatic stay, see Rule 30.8, if leave to appeal is granted, we are informed, a stay is ordinarily ordered by the court that granted leave. Centre Brief 23; Guide to Good Practice, Part IV–Enforcement, ¶74, at 19–20, n. 111. Appeals are then fast-tracked with a target of six weeks for disposition. Centre Brief 24. See also *DL* v. *EL*, [2013] EWHC 49, ¶¶42–43 (describing the English practice and observing that "[t]he whole process is . . . very swift, and the result-ant period of delay and uncertainty much curtailed by com-parison with [the United States]").

By rendering a return order effectively final absent leave to appeal, the rules governing Convention proceed-ings in England and Wales aim for speedy implementation without turning away appellants whose pleas may have merit. And by providing for stays when an appeal is well founded, the system reduces the risk of rival custody proceedings. Congressional action would be necessary if return-order appeals are not to be available in U. S. courts as a matter of right, but legislation requiring leave to appeal would not be entirely novel. See 28 U. S. C. §2253(c) (absent a certificate of appealability from a circuit justice or judge, an appeal may not be taken from the final decision of a district judge in a habeas corpus proceeding or a proceeding under 28 U. S. C. §2255); cf. Guide to Good Practice, Part IV–Enforcement, §2.5, at 16 (suggesting that, to promote expedition, Contracting States might consider a requirement of leave to appeal); *id.*, Part II–Implementing Measures, §6.6, at 37 (measures to promote speed within the appeals process include "limiting the time for appeal from an adverse decision [and] requiring permission for appeal" (footnote omitted)).

Lynne Chafin filed her petition for a return order in May 2011. E. C. was then four years old. E. C. is now six

and uncertainty still lingers about the proper forum for adjudication of her parents' custody dispute. Protraction so marked is hardly consonant with the Convention's objectives. On remand, the Court rightly instructs, the Court of Appeals should decide the case "as expeditiously as possible," *ante*, at 13. For future cases, rulemakers and legislators might pay sustained attention to the means by which the United States can best serve the Convention's aims: "to secure the prompt return of children wrongfully removed to or retained in" this Nation; and "to ensure that rights of custody . . . under the law of one Contracting State are effectively respected in the other Contracting States." Art. 1, Treaty Doc., at 7.