Partial Concurrence and Partial Dissent by Judge WARDLAW
OPINION
McKEOWN, Circuit Judge:
This appeal tests the limits of federal court jurisdiction to hear a habeas petition brought under the Indian Civil Rights Act (“ICRA”), 25 U.S.C. §§ 1301-1303, where the underlying claim arises not from an actual detention or imprisonment, but instead from a tribe’s temporary exclusion of its own members.[1]
Congress enacted the ICRA in 1968 in response to a “long line” of federal court decisions exempting Indian tribes from constitutional restraints. See Cohen’s Handbook of Federal Indian Law § 1.07, at 97 (Nell Jessup Newton ed., 2012) [Cohen’s]; see also Michigan v. Bay Mills Indian Cmty., — U.S. -, 134 S.Ct. 2024, 2030, 2037, 188 L.Ed.2d 1071 (2014) (noting that Indian tribes possess a “special brand of sovereignty” that predates, and is consequently not bound by, the Constitution). The Act extended to tribes most (but not all) of the civil protections in *866 the Bill of Rights. See David H. Getches et ah, Federal Indian Law 380-81 (6th ed. 2011). The ICRA created a new federal habeas remedy “to test the legality of ... detention by order of an Indian tribe.” 25 U.S.C. § 1303. Because § 1303 provides the exclusive federal remedy for tribal violations of the ICRA, unless a petitioner is in “detention by order of an Indian tribe,” the federal courts lack jurisdiction over an ICRA challenge and the complaint must be brought in tribal court. See Santa Clara Pueblo v. Martinez, 436 U.S. 49, 65, 67, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978).
The question here is whether a temporary exclusion from tribal land, but not the entire reservation, constitutes a detention under the ICRA. Reading the ICRA’s ha-beas provision in light of the Indian canons of construction and Congress’s plenary authority to limit tribal sovereignty, we hold that the district court lacked jurisdiction under § 1303 of the ICRA to review this temporary exclusion claim.
Background
Before the first Europeans arrived in California, as many as 350,000 Indians lived within the state’s borders, speaking up to eighty different languages. S. Rep. No. 103-340, at 1 (1994). By the time Mexico ceded California to the United States in 1848, the indigenous population had dropped to approximately 150,000 people; by 1900, it had plummeted to about 15,000. Id. at 1-2. This decline was not, of course, unique to California, but instead mirrored the effects of disease, war, and removal policies on tribes across the country.
One of the indigenous groups still in California at the turn of the century was the Auburn Band, “a small, cohesive band of Indians” that lived about forty miles outside of Sacramento. Id. at 4. By 1953, the federal government had acquired forty acres of land (the “Auburn Ranchería” or “Ranchería”) in trust on the Band’s behalf. Id. But by the mid-1950s, Congress adopted a policy of “assimilation through termination,” Cohen’s § 1.06, at 85, and the Auburn Ranchería was ultimately terminated in 1967. S. Rep. No. 103-340, at 5. As a result, “[RJancheria lands formerly held in tribal or community ownership” were divided and distributed. H.R. Rep. No. 103-812, at 22 (1994).
The Tribe’s history is a microreflection of congressional seesawing on tribal governance over the past century. The so-called Termination Era of the 1950s saw Congress end the “historic relationships” between specified tribes and the federal government, defund federal tribal assistance programs, and give named states civil and criminal jurisdiction over individual Indians with an option for other states to assume such jurisdiction. Cohen’s § 1.06, at 91. It was in this context that the Ranchería was terminated.
But blowback to the “disastrous results” of termination came swiftly, and by the 1960s,'the federal government had adopted a policy of strengthening tribal self-government and self-determination. Id. § 1.07, at 94. This shift in focus led Congress to “enact[] special acts restoring a substantial number of previously terminated tribes,” id. § 1.07, at 97, including the Auburn Indian Restoration Act in 1994, 25 U.S.C. § 1300Z-1300Z-7.
Today, the historic Band is known as the United Auburn Indian Community (“UAIC”. or “Tribe”). The UAIC owns twelve parcels of land on the historic Ranchería, including a preschool, a community service center, foster homes, and recreational facilities. It ‘ also owns off-Rancheria facilities, including the Thunder Valley Casino Resort. The remaining twenty-one parcels of land on the Ranchería are privately owned, not tribally owned or controlled.
*867 In keeping with the goals of current federal Indian policy, the Tribe is self-governing. It is run by an elected five-member Tribal Council, which enacts legislation and takes executive action. The Council also disciplines tribal members for civil violations of the Tribe’s constitution and ordinances. Like.many tribes today, the UAIC does not have a criminal code and does not exercise criminal jurisdiction over its members.
The Tribe adopted a constitution and bylaws, three of which are particularly implicated by this appeal. Ordinance 2004-001 III(B) imposes a duty on all tribal members “to refrain from damaging or harming tribal programs or filing of false information in connection with a tribal program.” Ordinance 2004-001 III(I) requires members to “refrain from defaming the reputation of the Tribe, its officials, its employees or agents outside of a tribal forumf.]” And the Enrollment Ordinance provides that a Tribe member can be punished — up to and including disenrollment — for making misrepresentations against the Tribe.
This appeal arises out of actions taken by the Tribal Council in 2011. Petitioners Jessica Tavares, Dolly Suehead, Donna Caesar, and Barbara Suehead (collectively, “the petitioners”) disagreed with how the Council was governing internal tribal affairs and, on November 7, 2011, they submitted a recall petition to the Tribe’s Election Committee.[2] The recall petition raised a litany of allegations against the members of the Council: financial mismanagement, retaliation, electoral irregularity, denial of due process, denial of access to an audit, and restrictions on access to Tribe members’ mailing addresses. The Election Committee rejected the recall petition after determining that it did not have signatures from forty percent of tribal members, some of the signatures were not notarized, and some signatories did not provide a date and address, as required by a tribal ordinance.[3]
Around the same time, the petitioners circulated to mass media outlets two press releases detailing their complaints. The first press release stated that the Council had engaged in “questionable financial practices” and “cover-ups of financial mis-dealings,” that the Council had “fraudulently” refused to conduct a financial audit of the Tribe’s resources, and that the Tribe’s elections were- “dishonest and rigged.” After the Election Committee denied the recall petition, the petitioners circulated the second press release, which alleged that the Council had “scuttle[d]” the petition.
Four days after the recall petition was rejected, the Council sent each petitioner a Notice of Discipline and Proposed Withholding of Per Capita. The Notices stated that the petitioners’ press releases “contained numerous inaccurate, false and defamatory statements” that wound up being published in non-tribal news outlets like the Sacramento Bee. The Notices informed the petitioners that, through the press releases, the petitioners had “[rjepeatedly libelfed] and slander[ed] the Tribe and its agents maliciously and in disregard of the truth in non-tribal forums” and had taken *868 “[h]armful and damaging actions to tribal programs, specifically our tribal businesses and government, and provided] outsiders with false information about tribal programs,” in violation of tribal law. The Notices also stated that the Council had voted to withhold the petitioners’ per capita distributions and to ban them temporarily from tribal lands and facilities.
The exclusion orders were effective immediately. The petitioners were barred from tribal events, properties, offices, schools, health and wellness facilities, a park, and the casino. During their terms of exclusions, the petitioners could not run for tribal office, but they could vote in tribal elections through absentee ballots. They were not excluded from the twenty-one privately owned parcels of land, including their own homes and land owned by other members of the Tribe, and they retained their tribal health care benefits. Tavares was excluded for ten years, while the others were excluded for two years. None of the petitioners had a right to a hearing or an appeal on the exclusion orders.
The Notices also stated that the Council intended to withhold the petitioners’ “per capita distributions and all other financial benefits and membership privileges,” excluding health care benefits, for four years (as to Tavares) and six months (as to the others). Unlike the exclusion orders, the withholding orders were not effective immediately. Instead, the petitioners were entitled to a hearing before the Council and to an appeal. The Council confirmed the proposed suspension of the petitioners’ per capita distributions after a hearing.
On appeal, the Appeals Board affirmed the Council’s findings and actions in a thirty-page thoroughly-reasoned decision. It rejected the petitioners’ constitutional challenge to the Tribe’s anti-defamation ordinance on three grounds: (1) the petitioners’ arguments “ignore[d] entirely federal Indian law,” (2) the ordinance “d[id] not violate the Tribe’s Constitution,” and (3) the ordinance satisfied federal constitutional standards. The Appeals Board affirmed the Council’s finding that the petitioners had violated tribal law, concluding that the press releases “sounded a loud (and inaccurate) warning bell to [local businesses and governments] that decisions made by our Tribe and casino may not be reliable, and even illegal, and that our Tribe and casino may not be a stable partner for business or even accepting a donation.” According to the Appeals Board, the petitioners’ “sensationalized publicity stunt ... harms the Tribe, its government infrastructure, its business activities ..., and the future of tribal members. It has been our tribal custom and tradition to protect this Tribe and its institutions from the harm caused by this type of defamation outside the tribal forum. Our ability to be taken seriously as a tribal government and business partner depends on it.”
The Appeals Board concluded that the length of the original withholding orders was fair, but acknowledged the unique cultural factors at play: “We, as tribal members, have distrust of authority bred- into us, after centuries of broken promises. We also are concerned about each individual appellant here, who all have families. We are a Tribe composed of a few extended families. Each of us has dependents who we care for. The culture and tradition of this Tribe has been to take care of each other.” Thus, “after reflection on and discussion about our tribal customs and traditions and values,” the Appeals Board reduced Tavares’ per capita withholding by six months (making her ultimate withholding sanction total three-and-a-half years) and the other petitioners’ per capita withholding by one month (making their with *869 holding sanctions total five months).[4]
The petitioners filed a petition for a writ of habeas corpus in federal court under 25 U.S.C. § 1303 of the ICRA against the members of the Council.[5] The district court dismissed the petition for lack of subject matter jurisdiction, concluding that the petitioners’ punishment was not a “detention” sufficient to invoke federal habeas jurisdiction.
Analysis
I. Principles Animating Habeas Jurisdiction Under § 1303 of the Indian Civil Rights Act
We ground our opinion in two foundational principles in the Indian law canon — tribal sovereignty and congressional primacy in Indian affairs. We have long recognized that Indian tribes are “distinct, independent political communities, retaining their original natural rights.” Worcester v. Georgia, 31 U.S. (6 Pet.) 515, 559, 8 L.Ed. 483 (1832). While tribes lack “the full attributes of sovereignty,” they retain the power of self-government. United States v. Kagama, 118 U.S. 375, 381-82, 6 S.Ct. 1109, 30 L.Ed. 228 (1886). Tribal sovereignty offers “a backdrop against which the applicable ... federal statutes must be read.” McClanahan v. State Tax Comm’n of Ariz., 411 U.S. 164, 172, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973). In other words, to the extent a statute is ambiguous, we construe it liberally in favor of the tribes’ inherent authority to self-govern. See, e.g., Ramah Navajo Sch. Bd., Inc. v. Bureau of Revenue, 458 U.S. 832, 846, 102 S.Ct. 3394, 73 L.Ed.2d 1174 (1982) (“We have consistently admonished that federal statutes and regulations relating to tribes ... must be ‘construed generously in order to comport with ... traditional notions of [Indian] sovereignty and with the federal policy of encouraging tribal independence.’ ” (first alteration added) (quoting White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 144, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980))).
A second well-recognized principle is Congress’s “constitutionally prescribed primacy in Indian affairs.” Cohen’s § 2.01[1], at 110; see also Washington v. Confederated Bands & Tribes of Yakima Indian Nation, 439 U.S. 463, 470-71, 99 S.Ct. 740, 58 L.Ed.2d 740 (1979) (describing Congress’s authority over Indian affairs as “plenary and exclusive”). Because Congress’s jurisdiction is plenary, our jurisdiction is correspondingly narrow. See Lone Wolf v. Hitchcock, 187 U.S. 553, 565, 23 S.Ct. 216, 47 L.Ed. 299 (1903) (“Plenary authority over the tribal relations of the Indians has been exercised by Congress from the beginning, and the power has always been deemed a political one, not subject to be controlled by the judicial department of the. government.”). Hence, we refrain from interpreting federal statutes in a way that limits tribal autonomy unless there are “clear indications” that Congress intended to do so. Santa Clara Pueblo, 436 U.S. at 60, 98 S.Ct. 1670.
 Because Indian tribes have sovereignty that predates the Constitution, they are not subject to the constitutional restraints that bind the federal government and the states. See Talton v. Mayes, 163 U.S. 376, 382-84, 16 S.Ct. 986, 41 L.Ed. 196 (1896). Congress can, however, impose such restraints by statute as part *870 of its plenary authority over tribal affairs. In 1968, Congress exercised this authority and enacted the ICRA, which extends much of the Bill of Rights to tribes by statute.[6] The ICRA also contains an explicit federal habeas remedy: “The privilege of the writ of habeas corpus shall be available to any person, in a court of the United States, to test the legality of his detention by order of an Indian tribe.” 25 U.S.C. § 1303.
The Supreme Court first analyzed the scope of federal court jurisdiction under the ICRA in Santa Clara Pueblo, 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106. The Court held that the ICRA’s substantive rights (contained in § 1302 of the statute) did not imply a federal remedy; instead, § 1303 set out the exclusive remedy for violations of the ICRA — a writ of habeas corpus “in a Court of the United States.” Id. at 69-72, 98 S.Ct. 1670. As part of its analysis, the Court noted that one of the primary purposes in enacting the ICRA was to “promote the well-established federal policy of furthering Indian self-government.” Id. at 62, 98 S.Ct. 1670 (citations and internal quotation marks omitted). Although the Court recognized that Congress also intended to “strengthen[ ] the position of individual tribal members vis-a-vis the tribe,” it concluded that finding an implied cause of action would strengthen this goal only at the expense of tribal sovereignty. Id. In sum,' federal remedies beyond habeas were “not plainly required to give effect to Congress’ objective[s].” Id. at 65, 98 S.Ct. 1670. With these principles in mind, we address whether the district court had habeas jurisdiction over the per capita withholding or the temporary exclusion orders.
II. Per Capita Withholding Orders
As a threshold matter, we quickly dispose of the argument that the petitioners’ per capita withholding orders created ha-beas jurisdiction under the ICRA.[7]
In Shenandoah v. U.S. Department of the Interior, the Second Circuit explained that the loss of quarterly distributions paid to all tribal members is “insufficient to bring plaintiffs within ICRA’s habeas provision,” 159 F.3d 708, 714 (2d Cir. 1998), a determination that we cited with approval in Jeffredo v. Macarro, 599 F.3d 913, 919 (9th Cir. 2009). This conclusion falls squarely within the “general rule” that “federal habeas jurisdiction does not operate to remedy economic restraints.” Shenandoah v. Halbritter, 366 F.3d 89, 92 (2d Cir. 2004); see also United States v. Thiele, 314 F.3d 399, 402 (9th Cir. 2002) (writing that cognizable claims “do not run interference for non-cognizable claims”). Any disputes about per capita payments must be brought in a tribal forum, not through federal habeas proceedings. See 25 C.F.R. § 290.23; Lewis v. Norton, 424 F.3d 959, 963 (9th Cir. 2005).
III. Temporary Exclusion Orders
We now turn to the crux of this appeal — whether the petitioners, who were temporarily excluded from ■ tribal lands, were in ..“detention” under § 1303 for purposes of federal habeas jurisdiction.[8]
*871 We start with the words Congress used in § 1303, focusing on a difference between the language used in that provision and the language used in the general federal habeas statutes. When Congress enacted the ICRA in 1968, it was legislating against a well-established habeas framework: the federal courts have habeas jurisdiction whenever a petitioner is “in custody.” See 28 U.S.C. §§ 2241, 2255;[9] see also Jones v. Cunningham, 371 U.S. 236, 236, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963) (quoting 28 U.S.C. § 2241); Judiciary Act of Sept. 24, 1789, § 14, 1 Stat. 73, 82. Yet Congress chose not to incorporate this language into the ICRA. Instead, under § 1303, habeas corpus is available only to a person who wishes to “test the legality of his detention by order of an Indian tribe.” In addition to the usual rule that different words in a statute ordinarily convey different meanings, S.E.C. v. McCarthy, 322 F.3d 650, 656 (9th Cir. 2003), we think Congress’s use of “detention” instead of “custody” when it created habeas jurisdiction over tribal actions is significant in multiple respects.
At the time Congress enacted the ICRA, “detention” was generally understood to have a meaning distinct from and, indeed, narrower than “custody.” Specifically, “detention” was commonly defined to require physical confinement. See, e,g., Preiser v. Rodriguez, 411 U.S. 475, 484-85, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973) (equating “detention” and “physical confinement”); see also Ballentine’s Law Dictionary 343 (3d ed. 1969) (defining “detention” as “Molding one arrested on a charge of crime”). By contrast, “custody” had a more fluid definition: while it meant “physical control of the person,” it did not require physical confinement or imprisonment. Id. at 300. Instead, a person was in custody for habe-as purposes if there was “restraint of [that] person by another [such] that the latter can produce the body of the former at a hearing as directed by writ or order.” Id. In other words, at the time of the ICRA’s enactment, detention was understood as a:subset of custody. See also Black’s Law Dictionary 460 (4th ed. 1968) (defining “custody” as encompassing “[d]e-tention; charge; control; possession” and noting that “[t]he term is very elastic and may mean actual imprisonment or physical detention or mere power, legal or physical, of imprisoning or of taking manual possession”).
*872 It is also notable that Congress used “detention” at the same time that the Supreme Court had begun to expand the scope of “custody” in the federal habeas statutes. Courts “normally assume that, when Congress enacts statutes, it is aware of relevant judicial precedent.” Merck & Co. v. Reynolds, 559 U.S. 633, 648, 130 S.Ct. 1784, 176 L.Ed.2d 582 (2010). The history and precedent here are informative.
Under English common law, and for much of our history, physical custody, confinement, or detention was required as a prerequisite to habeas relief. See, e.g., Rumsfeld v. Padilla, 542 U.S. 426, 437, 124 S.Ct. 2711, 159 L.Ed.2d 513 (2004) (recognizing that “we no longer require physical detention as a prerequisite to habeas relief’); Preiser, 411 U.S. at 486, 93 S.Ct. 1827 (collecting cases in which the petitioner complained of “being unlawfully subjected to physical restraint”); Wales v. Whitney, 114 U.S. 564, 569, 5 S.Ct. 1050, 29 L.Ed. 277 (1885) (finding no habeas jurisdiction where “petitioner [wa]s under no physical restraint”); 3 William Blackstone, Commentaries *129-37. Beginning in 1963, however, the Supreme Court expansively interpreted “custody” to include continued oversight by criminal justice authorities with the prospect of revocation of parole and return to incarceration. See Jones, 371 U.S. at 243, 83 S.Ct. 373 (holding that parolee was in custody, in part because he remained subject to the custody and control of the state parole board); see also Hensley v. Mun. Court, 411 U.S. 345, 351, 93 S.Ct. 1571, 36 L.Ed.2d 294 (1973) (formulating the “severe restraint[ ] on individual liberty” test for custody, and holding that petitioner was in custody when he was released on personal recognizance pending execution of his sentence).[10]
By the time Congress enacted the ICRA in 1968, this expansion of “custody” was well under way. The Supreme Court had already explained that “custody” should not be construed unduly narrowly because habeas “is not now and never has been a static, narrow, formalistic remedy; its scope has grown to achieve its grand purpose' — the protection of individuals against erosion of their right to be free from wrongful restraints upon their liberty.” Jones, 371 U.S. at 243, 83 S.Ct. 373. Congress could have used the parallel “in custody” language or indicated that ICRA’s habeas provision was to be read in light of that jurisprudence by using “custody” rather than “detention,” but it did not do so.[11]
*873 Our conclusion that we should credit Congress’s use of “detention” to narrow the scope of federal habeas jurisdiction over ICRA claims is bolstered by the limited legislative history. During deliberations in the House of Representatives, House Minority Leader Gerald Ford submitted a memorandum from the House Committee on the Judiciary that equated detention in the ICRA context with imprisonment: under § 1303, the “habeas corpus application for release from tribal detention shall be made in the Federal courts (under present Constitutional practice, non-Indian citizens, if imprisoned under state law, must first seek habeas corpus by exhausting available state court remedies before applying to Federal courts.).” 114 Cong. Rec. 9611 (1968). Representative Reifel similarly explained that habeas corpus under the ICRA “would assure effective enforcement of ... fundamental [trial] rights” that arise in the criminal context, including the prohibition on double jeopardy, the privilege against self-incrimination, and the right to confront witnesses. Id. at 9553. As the Supreme Court in Santa Clara Pueblo recognized, Congress’s “legislative investigation revealed that the most serious abuses of .tribal power had occurred in the administration of criminal justice. In light of this finding, ... Congress chose at this stage to provide for federal review only in habeas corpus proceedings.” 436 U.S. at 71, 98 S.Ct. 1670 (internal citation omitted); see also id. at 67, 98 S.Ct. 1670 (describing “habeas corpus as the exclusive means for federal-court review of tribal criminal proceedings”); William C. Canby, Jr., American Indian Law in a Nutshell 422 (6th ed. 2014) (concluding that, posL-Santa Clara Pueblo; “the effectuation of the non-criminal portions of the Indian Civil Rights Act lies exclusively with [the tribal courts]”).[12]
Three cases that involve the limits of detention under § 1303 inform our analysis. We begin with Poodry, the first case to address this issue. 85 F.3d 874. The petitioners, members of the Tonawanda Band, were convicted of treason after they accused the tribal council of misconduct. Id. at 877-78. As punishment, the tribe disen-rolled them and permanently banished them from the whole of the tribe’s 7,500 acre reservation. Id. at 878. The disenrollment and banishment orders were served on the petitioners at their homes by up to twenty-five people, who attempted to take the petitioners “into custody and eject them from the reservation.” Id. Although the initial ejection attempts failed, the re *874 spondents “continued to harass and assault the petitioners and their family members,” attacking one petitioner on Main Street and “stoning” a second petitioner. Id. The tribe also denied the petitioners home electrical services and health services and medications. Id.
The Second Circuit held that the ICRA created federal habeas jurisdiction over the tribal actions. Construing ICRA’s “detention” requirement as “no broader” than the “custody” requirement of other federal habeas statutes, the Second Circuit concluded that the facts alleged — including the manner in which the banishment orders were served, the attempts at removal, the threats and assaults, and the denial of electrical services — constituted “severe restraints on [individual] liberty” under Hensley ⅛ custody test. Id. at 893-95.
The Second Circuit did not clearly distinguish between whether it was the disen-rollment or banishment of the petitioners that constituted the severe restraint on liberty, although it focused on the disen-rollment. See id. at 895 (“Indeed, we think the existence of the orders of permanent banishment alone ... would be sufficient to satisfy the jurisdictional prerequisites for habeas corpus. We deal here ... with the coerced and peremptory deprivation of the petitioners’ membership in the tribe and their social and cultural affiliation.” (emphasis added)); see also id. at 897 (characterizing the question at issue as “whether a federal court has jurisdiction to examine the scope of and limitations on the Tonawanda Band’s power to strip the petitioners of their tribal membership”); id. at 901 (rejecting argument that “membership determinations [are] committed to the absolute discretion of the tribe”).
Two years later, in Shenandoah, the Second Circuit revisited jurisdiction under the ICRA. 159 F.3d 708. The petitioners in Shenandoah, like the petitioners in Poo-dry, were members of a tribe who challenged tribal leadership. The petitioners alleged that, because of these activities, they lost their jobs, their “voice[s]” in tribal governance, their health insurance, their access to the tribe’s health center, and their quarterly per capita distributions; were banished from tribal businesses and recreational facilities; were stricken from tribal membership rolls; were prohibited from speaking with some tribe members; and were not sent tribal mailings. Id. at 714.
Significantly, the Second Circuit stepped back from Poodry and limited its reach. It clarified that Poodry had only recognized federal habeas jurisdiction for cases involving permanent banishment. Id. at 714 (citing Poodry in support of the proposition that “[h]abeas relief does address more than actual physical custody, and includes parole, probation, release on one’s own recognizance pending sentencing or trial, and permanent banishment”). The Second Circuit then concluded that the tribe’s misconduct at issue in Shenandoah, while “serious,” was not a sufficiently severe restraint on liberty to create habeas jurisdiction. Id.
Notably, the Second Circuit again conflated disenrollment and banishment in its analysis. The court characterized the punishment in Poodry as considerably more severe than the punishment in Shenandoah because in Poodry, “the petitioners were convicted [ ] of treason, sentenced to permanent banishment, and stripped of ... Indian citizenship; their names were removed from the Tribal rolls; and they permanently [lost] any and all rights afforded [tribal] members.” Id. (internal quotation marks omitted). By contrast, the petitioners in Shenandoah “[did] not allege[] that they were banished from the Nation, deprived of tribal membership, convicted of any crime, or that defendants *875 attempted in anyway [sic] to remove them from [tribal land].” Id.
■ In 2010, our court addressed the scope of habeas jurisdiction under § 1303 of the ICRA in Jeffredo, 599 F.3d 913. The Pe-changa Band of the Luiseño Mission Indians disenrolled a number of its members following a dispute about their lineage. Id. at 915. As a result of their disenrollment, the petitioners lost access to the tribe’s senior citizen center, health clinic, and schools. Id. at 918-19. Although they were not excluded from the reservation, the petitioners contended that, because of their new status as nonmembers, they were “under a continuing threat of banishment/exclusion.” Id. at 919. They filed a habeas petition under the ICRA, arguing that their disenrollment “was tantamount to an unlawful detention.” Id. at 915.
We held that the district court lacked jurisdiction because the petitioners were not detained under § 1303. Id. We engaged in a factual inquiry about the severity of the restrictions the petitioners faced, noting that the petitioners “have not been banished from the Reservation,” “have never been arrested, imprisoned, fined, or otherwise held by the Tribe,” “have not been evicted from their homes or suffered destruction of their property,” have not had “personal restraint (other than access to [certain] facilities)” imposed on them, and have not had their movements on the Reservation subject to restriction. Id. at 919.
Unlike the Second Circuit, we distinguished between disenrollment and banishment, and recognized that there is -no federal habeas jurisdiction over tribal membership disputes. Id. at 920 (citing Santa Clara Pueblo, 436 U.S. at 72 n.32, 98 S.Ct. 1670) (observing that “[w]e cannot circumvent our lack of jurisdiction over [tribal decisions regarding disenrollment of members] by expanding the scope of the writ of habeas corpus to cover exactly the same subject matter”).[13]
Looking at the statute and these cases, several principles emerge. First, we do not need to decide whether to adopt Poodry’s conclusion that tribal banishment orders amount to “detention” under § 1303, because even under Poodry’s logic, the Second Circuit limited habeas jurisdiction only to permanent banishment orders, not temporary exclusion orders like those in this case. Poodry, 85 F.3d at 901; see also Shenandoah, 159 F.3d at 714. In addition, we have already rejected Poodry’s assertion of federal habeas jurisdiction over tribal membership disputes. Compare Poo-dry, 85 F.3d at 901 (rejecting argument that “membership determinations [are] committed to the absolute discretion of the tribe”), with Jeffredo, 599 F.3d at 920 (“We find ... nothing in the legislative history of § 1303 that suggests the [habeas] provision should be interpreted to cover disen-rollment proceedings.”). We also have taken issue with Poodry’s assertion that a *876 tribe’s interference with “an individual’s social, cultural, and political affiliations” can create custody. Compare Poodry, 85 F.3d at 897, with Jeffredo, 599 F.3d at 921.[14]
Second, the federal courts lack jurisdiction to review direct appeals of tribal membership decisions because they fall within the scope of tribes’ inherent sovereignty. Jeffredo, 599 F.3d at 915. In many cases, a tribe’s decision to temporarily exclude a member will be another expression of its sovereign authority to determine the makeup of the community.[15] See Kunesh, supra note 1, at 86. Because exclusion orders are often intimately tied to community relations and membership decisions, we cannot import an exclusion-as-custody analysis from the ordinary habeas context. See Santa Clara Pueblo, 436 U.S. at 72 n.32, 98 S.Ct. 1670 (“A tribe’s right to define its own membership for tribal purposes has long been recognized as central to its existence as an independent political community. Given the often vast gulf between tribal traditions and those with which federal courts are more intimately familiar, the judiciary should not rush to create causes of action that would intrude on these delicate matters.” (citations omitted)).[16]
Third, tribes have the authority to exclude non-members from tribal land. See Merrion v. Jicarilla Apache Tribe, 455 U.S. 130, 142, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982) (recognizing tribes’ authority to exclude non-members); Hardin v. White Mountain Apache Tribe, 779 F.2d 476, 479 (9th Cir. 1985) (same). If tribal exclusion orders were sufficient to invoke habeas jurisdiction for tribal members, there would be a significant risk of undercutting the tribes’ power because “any person,” members and nonmembers alike, would be able to challenge exclusion orders through § 1303. Thus, tribal sovereignty vis-a-vis exclusion of non-members would collide with habeas jurisdiction.
■ With this framework in mind, we return to the principles animating habeas jurisdiction under § 1303 of the ICRA. We view Congress’s choice of “detention” rather than “custody” in § 1303 as a meaningful restriction on the scope of habeas juris *877 diction under the ICRA. See Merck & Co., 559 U.S. at 648, 130 S.Ct. 1784. But to the extent that the statute is ambiguous, we construe it in favor of tribal sovereignty. Ramah Navajo Sch. Bd., Inc., 458 U.S. at 846, 102 S.Ct. 3394; Cohen’s § 2.02[1], at 113. A temporary exclusion is not tantamount to a detention. And recognizing the temporary exclusion orders at issue here as beyond the scope of “detention” under the ICRA bolsters tribes’ sovereign authority to determine the makeup of their communities and best preserves the rule that federal courts should not entangle themselves in such disputes.
Petitioners’ contrary reading of the statute cannot be reconciled. They make much of the fact that their cases do not involve disenrollment and argue that we should distinguish Jejfredo on this basis. We agree that it is significant that the petitioners have only been temporarily excluded, but we disagree with the conclusion they draw. If we adopted the petitioners’ proposed rule that exclusion of any duration creates habeas jurisdiction, it would create a perverse incentive for tribes to first disenroll and then banish a member. Because federal courts lack jurisdiction over membership decisions, and because tribes have authority to exclude non-members from tribal lands, this two-step dance could be a loophole to avoid federal jurisdiction under the ICRA. By incentivizing disenrollment, the petitioners’ proposed construct runs counter to Congress’s goal of “strengthening the position of individual tribal members vis-a-vis the tribe” by enacting the ICRA. Santa Clara Pueblo, 436 U.S. at 62, 98 S.Ct. 1670.
Nor is the dissent’s interpretation of § 1303 persuasive. As we have explained, statutory interpretation and the legislative history support reading detention more narrowly than custody, but to the extent that the statute is ambiguous, we construe the statute in favor of Indian sovereignty in accord with the Indian canons of construction. See Ramah Navajo Sch. Bd., Inc., 458 U.S. at 846, 102 S.Ct. 3394; Cohen’s § 2.02[1], at 113. These canons seemingly play no role in the dissent’s analysis. Instead, the dissent claims that to preserve the balance Congress struck “between the protection of tribal sovereignty and the vindication of civil rights,” “we ought simply to apply the standard of federal habeas law.” Dissent 888.
The dissent fails to recognize that it is precisely the indiscriminate importation of an external body of law into the ICRA that risks trenching upon that balance. Under its reading, even if a tribe member was disenrolled from the tribe, the tribe’s decision to exclude that former member would still be subject to judicial review, even while a decision to exclude a non-member would not be. See Dissent 888-89. The dissent argues that former tribe members should enjoy a special status because “[tjribes’ power to ban nonmembers from their land is rooted in their inherent power as separate sovereigns,” while “tribes’ power to ban tribal members from their land was explicitly ‘limit[ed]’ and ‘mod-if[ied]’ by Congress’s use of its ‘plenary authority’ to provide individual rights to American Indians and to establish a narrow mechanism of review to protect those rights.” Dissent 888-89 (second and third alterations in original). This reading of the ICRA cannot be reconciled with the statute itself: the ICRA does not “explicitly” address exclusion orders, and many of its provisions, including § 1303, apply to tribe members and non-members alike. See also 25 U.S.C. § 1302. Nor does the dissent explain why it would be an intrusion on tribal sovereignty to prevent a tribe from excluding non-members, but not an intrusion to prevent a tribe from excluding former or current tribe members. On the contrary: as we have observed, the ability *878 to determine the membership of the community has long been regarded as an essential attribute of sovereignty.
Thus, we conclude that the district court lacked jurisdiction under § 1303 of the ICRA to review the challenge to the temporary exclusion orders. In so holding, we in no way minimize the significance of petitioners’ allegations or the personal impact of the exclusion orders. The petitioners raise free speech and due process claims that implicate the substantive protections Congress saw fit to grant Indians with respect to their tribes through the ICRA. See Quair v. Sisco, 359 F.Supp.2d 948, 962 (E.D. Cal. 2004) (“Section 1302 [of the ICRA] provides that no Indian tribe in exercising powers of self-government shall do or fail to do the things set forth in Section 1302.”). But the petitioners’ remedy is with the Tribe, not in the federal courts. Cf. Fisher v. Dist. Court, 424 U.S. 382, 390-91, 96 S.Ct. 943, 47 L.Ed.2d 106 (1976) (“[E]ven if a jurisdictional holding occasionally results in denying an Indian plaintiff a forum to which a non-Indian has access, such disparate treatment of the Indian is justified because it is intended to benefit the class of which he is a member by furthering the congressional policy of Indian self-government.”).
APPEAL. DISMISSED AS MOOT WITH RESPECT TO DOLLY AND BARBARA SUEHEAD AND - DONNA CAESAR AND AFFIRMED FOR LACK OF JURISDICTION WITH RESPECT TO ALL PETITIONERS.

. The parties dispute whether the petitioners were temporarily ''banished” or temporarily "excluded.” We use the term "exclusion,” but ascribe no special significance to the word. See Patrice H. Kunesh, Banishment as Cultu-raUustice in Contemporary TribalLegalSys-tems, 37 N.M. L. Rev. 85, 88 n.17 (noting that “exclusion” and "banishment” are often used interchangeably).

. Under the Tribe’s constitution, "[u]pon receipt of a petition signed by at least forty percent (40%) of the qualified voters of the [UAIC], it shall be the duty of the Election Committee established by this Constitution to call and conduct within thirty (30) days an election to consider the recall of an elected official.”

. The petitioners claim that the petition did in fact have signatures from forty percent of the Tribe and that they had no notice of the other requirements. This dispute is not before us; we take no position on which version of the facts is true.

. As to petitioners Dolly Suehead, Donna Caesar, and Barbara Suehead, the exclusion orders expired on November 15, 2013 and the per capita withholding orders expired on May 1. 2012.

. Gene Whitehouse, Brenda Adams, and Calvin Moman were members of both the 2011 and 2013 Councils. John Williams and Danny Rey were members only of the 2013 Council.

.The rights in the ICRA are similar, but not identical, to those contained in the Bill of Rights. For example, the statute has no requirement that tribes provide free counsel for indigent criminal defendants in tribal court. See United States v. Bryant, - U.S. -, 136 S.Ct. 1954, 1958-59, 195 L.Ed.2d 317 (2016).

. Although it is not entirely clear in their briefs, the petitioners appear to argue that withholding of distributions creates habeas jurisdiction in whole or part. To the extent they raise this argument, we address it here.

. The two-year exclusion orders applicable to Dolly and Barbara Suehead and Donna Cae *871 sar expired before briefing in this appeal was completed and hence there is no longer a .live controversy. Chafin v. Chafin, 568 U.S. 185, 133 S.Ct. 1017, 1023, 185 L.Ed.2d 1 (2013). Even assuming habeas jurisdiction were proper, petitioners' suggestion that the expired orders had continuing consequences in a ha-beas sense is totally speculative. Thus, we dismiss their appeals on mootness grounds, and also affirm the district court’s dismissal of their claims on jurisdictional grounds.

. The requirement that a petitioner be “in custody" is stated in every section of the statutory provisions for state and federal habeas jurisdiction. See 28 U.S.C. §§ 2241(c)(l)-(4) (“The writ of habeas corpus shall not extend to a prisoner unless — (1) He is in custody under or by color of the authority of the United States or is committed for trial before some court thereof; or (2) He is in custody for an act done or omitted in pursuance of an Act of Congress, or an order, process, judgment or decree of a court or judge of the United States; or (3) He is in custody in violation of the Constitution or laws or treaties of the United States; or (4) He, being a citizen of a foreign state and domiciled therein is in custody for an act done or omitted under any alleged right, title, authority, privilege, protection, or exemption claimed under the commission, order or sanction of any foreign state, or under color thereof....” (emphases added)), 2254(a) (rendering habeas relief available to “a person in custody pursuant to the judgment of a State court”), 2255(a) (rendering motions to “vacate, set aside or correct the sentence” available to "[a] prisoner in custody under sentence of a court established by Act of Congress”).

. Neither Jones nor Hensley mention, much less discuss, "detention.” See generally Hensley, 411 U.S. 345, 93 S.Ct. 1571, 36 L.Ed.2d 294; Jones, 371 U.S. 236, 83 S.Ct. 373, 9 L.Ed.2d 285.

. The only other court that has analyzed whether "detention” and “custody” should be interpreted differently determined only that "detention” should not be construed more broadly than "custody.” See Poodry v. Tonawanda Band of Seneca Indians, 85 F.3d 874, 890-93 (2d Cir. 1996); see also Jeffredo, 599 F.3d at 918 (citing the adoption of Poodry’s analysis by Moore v. Nelson, 270 F.3d 789, 791 (9th Cir. 2001)). The Second Circuit examined the federal habeas statutes, 28 U.S.C. § 2241 et seq., and concluded that they "appear[ ] to use the terms 'detention' and 'custody' interchangeably.” Poodry, 85 F.3d at 890-91. However, while some provisions of the federal habeas statutes appear to use the terms synonymously, others treat “detention” as a subset of “custody.” Compare, e.g., 28 U.S.C. § 2245 (last amended June 25, 1948) ("On the hearing of an application for a writ of habeas corpus to inquire into the legality of the detention of a person pursuant to a judgment the certificate of the judge who presided at the trial resulting in the judgment ... shall be admissible in evidence."), with id. § 2242 (last amended June 25, 1948) (stating that an “[ajpplication for a writ of habeas corpus ... shall allege the facts concerning the applicant’s commitment or detention" (emphasis added)). Even if these provisions create ambi *873 guity as to the meaning of the ICRA’s use of "detention,” such ambiguities must, be resolved in favor of the tribes’ inherent authority to self-govern. Ramah Navajo Sch. Bd., Inc., 458 U.S. at 846, 102 S.Ct. 3394; Cohen's § 2.02[1], at 113.

. We need not decide whether § 1303 applies only in the criminal context. We merely note that Congress was concerned with a narrower subset of tribal activity than would be covered under the current-day "custody’'' standard. On this point, the dissent argues that "detention” and "custody” should be understood as synonymous because the language of § 1303 tracks that of Colliflower v. Garland, 342 F.2d 369 (9th Cir. 1965), a pre-ICRA case extending general habeas jurisdiction over a tribe’s incarceration of a tribal member that was cited with approval during 1965 Senate subcommittee hearings on the ICRA. Dissent 881. But Colliflower extended general habeas jurisdiction for a reason not applicable here: because the tribe's courts, having been developed under the supervision and the guidelines of the Department of the Interior's Bureau of Indian Affairs, functioned "in part as a federal agency and in part as a tribal agency.” Id: at 379. Importantly, Colli-flower did not have occasion to consider the scope of "detention” because the court used the term to refer to a situation within the traditional confines of habeas corpus jurisdiction: Colliflower's incarceration pursuant to a criminal conviction. See id. at 371.

. The dissent's claim that Jeffredo is "binding precedent” that dictates the result is not borne out by an examination of the analysis. Dissent 882. Notably, Jeffredo relied on Moore as the sole authority supporting the proposition that detention "must be interpreted similarly" to custody, 599 F.3d at 918, and as Jeffredo itself acknowledges, Moore stated merely that "[tjhere is no reason to conclude that the requirement of 'detention' set forth in ... § 1303 is any more lenient than the requirement of 'custody' set forth in the other habeas statutes,” 270 F.3d at 791 (emphasis added). In stating that “an ICRA habeas petition is only proper when the petitioner is in custody,” Jeffredo correctly recognized that being “in custody” is a necessary condition for jurisdiction under the ICRA. 599 F.3d at 918. However, because the panel subsequently determined that the petitioners were not in custody, it did not have occasion to determine (as we do here) whether custody is a sufficient condition to create habeas jurisdiction under the ICRA.

.The dissent places great weight on Poodry, describing the case as the "leading authority’’ on banishment orders. See Dissent 885 n.9. Not only is Poodry inapposite for the reasons we have already outlined, but also, Poodry has been extensively criticized for disrupting the balance Congress struck in the ICRA between preserving tribal sovereignty and upholding the rights of individual tribe members. See, e.g., Cohen’s § 14.04[2], at 986-87 (observing that Poodry's "attempt[ ] to circumvent exclusive tribal jurisdiction disrupts] the delicate balance of tribal and federal interests established by Congress” and risks "insert[ing] the federal courts into precisely the types of internal tribal decisions that most implicate tribal sovereignty”); Kunesh, supra note 1, at 124 (criticizing Poodry for "unabashedly substituting] its own legal and cultural bias for the U.S. legal system and the rights and protections established under federal law”).

. The use of exclusion as a tool of social control is by no means unique to the tribes. See Nan Goodman, Banished: Common Law and the Rhetoric of Social Exclusion in Early New England 1-2 (2012) (noting that "inclusion and exclusion are paired” because they both help define the community).

. The dissent asserts that "[bjanishment has generally been held to satisfy the ‘in custody' requirement of the general habeas laws.” Dissent 884 (alteration in original) (quoting Cohen’s § 9.09, at 780-81) (internal quotation marks omitted). But the only authority the dissent cites for this proposition is Cohen’s Handbook of Federal Indian Law, which in fact states only that “banishment has been generally held to satisfy the 'in custody’ requirement” read into the ICRA by Poodry and two district court cases. See Cohen's § 9.09, at 780-81 & n.16. Again, this broad statement circles back to Poodry’s flawed analysis.